No. 32,279

CHARLES H. WARD and EMMA WARD, *Appellees*, v. HOME ROYALTY ASSOCIATION, *Appellant*.

(50 P. 2d 992)

Opinion filed November 9, 1935.

*H. W. Stubbs,* of Ulysses, *Eugene O. Monnet* and *Royce H. Savage,* both of Tulsa, Okla., for the appellant.

*C. E. Vance, C. R. Hope* and *A. M. Fleming,* all of Garden City, for the appellees.

The opinion of the court was delivered by

BURCH, C. J.: The action was one to cancel a mineral deed of land and to quiet title to the land. Plaintiffs recovered, and defendant appeals.

The Home Royalty Association of Oklahoma is a common-law trust, formed in 1926 under the laws of Oklahoma. Its principal office is at Tulsa. The purpose of the association, as stated in the declaration of trust, made by W. H. Helmerich, William Broadhurst and Albert Wilson, trustees, is to acquire oil and gas royalty interests and mineral rights in land and leases of various owners, to the extent of not exceeding one million acres in Oklahoma and elsewhere; and to consolidate such acquisitions into a trust estate. The trust estate is managed and controlled by the trustees. The trustees have power to buy, sell, lease, operate, convert, and reinvest, all as if sole owners. The trustees have power to contract with any person for disposition to him of an interest in net income of the association, in consideration for property or services. The trustees are the sole judges of value of property acquired by or services rendered to the trust estate.

The trustees have authority to distribute net income. The distributees are called "grantors" by the declaration of trust, and comprise two classes of persons: First, those who contribute property—landowners who put their royalties, mineral leases, or mineral deposits, in the pool. Second, persons who contribute services.

The trustees get 30 percent of the proceeds (not specified as net) of the association, as compensation for their services. The trustees get one dollar per acre in cash, in their individual capacities, for all acreage acquired, to cover agents' commissions and expenses. The trustees then participate in income as grantors, the same as those who contribute property.

The rule for sharing net income reads, in part, as follows:

"Each grantor shall share in the net income of the association (after making deductions for reserves and expenses) in the proportion which the value of his property or services received by the association shall bear to the total value of all property and services received by the association as shown by its books thirty days prior to payment."

Charles H. Ward, a resident of Haskell county, Kansas, owned 1,840 acres of land in that county. An agent of the association appeared at his home and initiated negotiations which resulted in Ward executing to the association a deed, signed also by his wife, conveying to the association a one-half interest in all oil, gas and other minerals in and under the land. Ward also signed a contract in duplicate, containing a provision that the mineral interest in the land would be held and administered, and he would participate in

net income, all in accordance with the declaration of trust. For participation purposes, the mineral interest was valued at $1,840.

The deed and copies of contract were delivered to the agent, who mailed them in Kansas to the association at its home office in Oklahoma. The contract provided that the association should have seven days after receipt of the documents to examine title to the land and then either refuse the conveyance and return all papers to Ward by registered mail, or accept the deed, sign the contract and send one copy to Ward by registered mail. The deed was accepted and a copy of the contract was signed and was sent from Oklahoma to Ward in Kansas within the time specified.

With the signed copy of contract, the association transmitted to Ward a duly executed participation certificate, the material portion of which reads:

"No. 1100.                                                  "Interest $1,840.00
"HOME ROYALTY ASSOCIATION OF OKLAHOMA
"TULSA, OKLAHOMA

"This certifies that the Home Royalty Association of Oklahoma has received the sum of eighteen hundred and forty dollars in services and/or property for which this certificate of beneficial interest in the Home Royalty Association of Oklahoma is issued to Charles H. Ward and Emma Ward, which is fully paid and nonassessable, and that the owner hereof is entitled to share in the net income of the association in the proportion which said sum so received bears to the total value of all property and services received by the association as shown by its books thirty days prior to any payment and distribution of said net income, in accordance with articles 8 and 10, of the original declaration of trust, dated February 23, 1926, and recorded in book 582, at page 45, of the county clerk's office of Tulsa county, Oklahoma."

This participation certificate is referred to in the statement of agreed facts, on which the judgment rests, as a stock certificate—which it was not—but the document itself is identified, and its terms are not in dispute.

The seventh stipulation of fact reads:

"7. That for the execution of said contract and said mineral conveyance the plaintiffs received no other consideration than the stock certificate above referred to."

The size of the pool when Ward came in is not disclosed, but immediately before and immediately after the transaction with Ward, the association had similar transactions with a large number of other farmers living in Haskell and other counties in Kansas.

The association had not complied with the speculative securities statute of Kansas requiring that a permit be obtained to sell or

dispose of speculative securities. (R. S. 17-1201 and following sections.) That the certificate was a speculative security within the meaning of the statute is not disputed. The result is, Ward conveyed to the association mineral in place, physically constituting part of his land in Kansas, for a participation certificate, received by him in Kansas, which was illegal in Kansas. (*Wigington v. Mid-Continent Royalty Co.*, 130 Kan. 785, 288 Pac. 749.)

The Home Royalty Association conveyed the mineral in Ward's land to the Home Royalty Association, Inc., a Delaware corporation, which was made a party defendant, and which, after disclaimers had been filed by other defendants, became sole defendant.

The only defense to the action presented in this appeal is that the transaction whereby the challenged deed became operative was interstate in character, application of the speculative securities act of this state would directly burden interstate commerce, and hence that the statute, if applied to the transaction, would be unconstitutional and void to that extent.

In different forms, schemes such as that embodied in the declaration of trust have been before this court in several cases. The court has declined to hold such schemes to be intrinsically fraudulent (*Moos v. Landowners Oil Ass'n*, 136 Kan. 424, 15 P. 2d 1073; *Beltz v. Griggs*, 137 Kan. 429, 20 P. 2d 510), but the legislature and the court have recognized that prosecution of such schemes is all too likely to be attended with overreaching and fraud.

In the Moos case just cited it was urged that because the promoters have absolute power to sell as if individual owners, they might make a sale to a confederate just before a "gusher" was brought in. In that event, all the grantors would get would be proportionate parts of income augmented by the sale price, in case of distribution of profits. The sellers would get the enormous proceeds of production. In the Moos case the association was a corporation with an apparently sound capital structure. Some of the results of operation were frankly disclosed, and the court declined to assume fraud would be practiced. The court did not foresee the extent to which such schemes would be promoted in Kansas, and did not take into account the practical helplessness of a Kansas farmer if compelled to resort to litigation to correct abuses in corporate or trust management.

In this instance, two of the three trustees of the Home Royalty Association joined with two other residents of Tulsa and a resi-

dent of Oklahoma City, in forming the Home Royalty Association, Inc. The corporation's principal place of business is at Tulsa. The corporation was formed on November 25, 1929, and on November 29 the Home Royalty Association conveyed the Ward mineral to the Home Royalty Association, Inc. The first purpose of the corporation, as stated in its charter, is to drill for, produce, refine, and in any other manner deal in and sell oil and gas and their products and by-products. For that purpose, the corporation had power to acquire land, royalties, leases and properties. It commenced business with a capital of $1,000. Among its earliest transactions was purchase from the trustees of the Ward mineral. The consideration which the Home Royalty Association received, forming proceeds distributable to grantors, unless needed to pay compensation to trustees and other expenses, is not disclosed, and the sale value of Ward's mineral is not disclosed. The court does not now impute bad faith to the trustee-incorporators, but it is quite manifest the business of buying Kansas mineral with participation certificates is a proper subject for legislative regulation.

Negotiation of purchases of mineral with participation certificates is likely to be accompanied with fraud. Apparently the grantee in Ward's deed recognized this fact. The grantee's agent exhibited to Ward the declaration of trust and a letter from the proposed grantee, a copy of which is not in the record, and so far as the record discloses, was not left with Ward. The agent took from Ward the contract which has been referred to, which contained the following provisions:

"Grantors acknowledge that a copy of said declaration of trust and a letter signed by grantee, which, together with this agreement, contain the only representations authorized by it, have been exhibited to them by the agent of grantee, and that no other representations have in any way induced them to execute said conveyance and this agreement."

So we have this picture: The agent sat in Ward's home indulging in airy nothings, if he spoke, or silently twiddling the charm on his watch chain, while farmer Ward and his wife mastered the voluminous and intricate provisions of the declaration of trust.

In the opinion in *Moos v. Landowners Oil Ass'n*, 136 Kan. 424, 15 P. 2d 1073, it was said:

"The inordinate birth rate of the 'sucker' is proverbial, and there is no birth-control measure adequate to inhibit the spawning of unscrupulous individuals who prey upon those who are easily duped. Hence we have a blue-sky law. That law, as it stood when the contract under consideration

was made, made it unlawful to sell any speculative securities without first obtaining a permit. Securities include certificates of participation, or other instruments of like nature, whatever the name. Speculative securities include those the value of which materially depends on proposed or promised future promotion or development, rather than on present tangible assets or conditions. (R. S. 17-1201, subdiv. 4.)" (p. 431.)

The transaction with Ward was contrived to get half the mineral in his land for a piece of paper which the association could not use by way of consideration in Kansas, and this applies both to the contract and to the participation certificate, which had the appearance of a certificate of stock, but merely verified the essential portion of the contract.

Ward did not go from Haskell county, Kansas, to Tulsa, Okla., to buy a trust participation certificate. The association sent an agent to Haskell county to get a deed of mineral in Ward's land. The agent got what he went after, a deed, retention of which by the grantee in truth and fact depended simply on good title. The agent also got from Ward a writing, nugatory except as an admission by Ward that he had not been defrauded. Ward got nothing. He was to be paid later, and the transaction was so framed by the association as to put Ward in the attitude of making an offer to buy, with an integral portion of his land, an interest in an Oklahoma common-law trust, which offer was to be transmitted to Oklahoma for acceptance. The so-called contract reads:

"Such conveyance and both duplicates of this agreement shall be mailed to grantee, at room 305, Tuloma Building, Tulsa, Okla. Grantee shall have seven (7) days time after receipt of same to examine title, and to either (a) reject the conveyance and return all papers to grantors, by registered mail; or (b) accept and retain said conveyance, and execute this agreement, so that the same may be a completed contract between the parties, and thereupon a duplicate hereof, so executed, shall be forwarded to grantors, at their above address, by registered mail."

The result was, Ward was paid with paper, a signed contract, giving him right of participation in proceeds of a trust, if there were any, and a formal certificate to the same effect. These papers were sent from Tulsa across the line between the states of Kansas and Oklahoma to Ward in Haskell county. They were both illegal in Kansas. The question is: May the blue-sky law of this state, designed solely to prevent fraud, be defeated in this way?

Time and space forbid promulgation of a fresh treatise on burden on interstate commerce and exercise of police power by a

state. It is sufficient to say this court regards the judgment of the district court, canceling the deed and quieting Ward's title to the land involved, as correct, and the judgment of the district court is affirmed.